UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | |
| | : | Chapter 11 |
| AEROGROUP INTERNATIONAL, INC., *et al.*,[1] | : | |
| | : | Case No. 17-11962 (KJC) |
| Debtors. | : | (Jointly Administered) |
| | : | (D.I. 1127) |
| | : | |
| | : | |
| AEROGROUP INTERNATIONAL, INC., *et al.* | : | |
| Plaintiffs, | : | |
| v. | : | Adv. Proc. No. 18-50715 (KJC) |
| | : | |
| GBG USA INC., | : | |
| Defendant. | : | |
| | : | |

## OPINION[2]

### BY:   KEVIN J. CAREY, UNITED STATES BANKRUPTCY JUDGE

Before the Court is the Debtors' Motion Pursuant to Federal Rule of Bankruptcy Procedure 9019 for Approval of Settlement (D.I. 1127) (the "Settlement Motion") seeking approval of the settlement agreement between the Debtors and GBG USA Inc. ("GBG") dated March 11, 2019 (the "Settlement Agreement") resolving adversary proceeding no. 18-50715. THL Corporate Finance, Inc. ("THL") filed a limited objection to the Settlement Motion.[3] The Debtors filed a reply to THL's Objection.[4] Polk 33 Lending, LLC ("Polk" or the "DIP Lender") also filed

---

[1] The debtors in these jointly administered chapter 11 cases are Aerogroup International, Inc., AGI Holdco, Inc., Aerogroup International LLC, Aerogroup International Holdings LLC, Aerogroup Retail Holdings, Inc., and Aerogroup Gift Card Company (the "Debtors").

[2] This Memorandum constitutes the findings of fact and conclusions of law, as required by Fed. R. Bankr. P. 7052. This Court has jurisdiction to decide this matter pursuant to 28 U.S.C. § 157 and § 1334(b). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (K) and (O).

[3] D.I. 1135.

[4] D.I. 1151

a response to THL's Objection and joinder to the Debtors' reply.[5] A hearing to consider the Settlement Motion was held on April 23, 2019, and, thereafter, THL and Polk filed post-hearing submissions.[6] For the reasons that follow, THL's limited objection will be overruled and the Settlement Motion will be granted.

BACKGROUND

The facts of this matter generally are not in dispute and many items are already a matter of record.

The bankruptcy filing and failed plan process

On September 15, 2017, the Debtors filed chapter 11 bankruptcy petitions in this Court. On October 24, 2017, the Debtors filed a chapter 11 plan that contemplated a dual track process to pursue either a restructuring or liquidation. Around the same time, the Debtors and GBG began exploring a potential deal whereby GBG would purchase the Debtors' inventory, leases and distribution contracts, and the Debtors would license their intellectual property to GBG.

On December 5, 2017, GBG and the Debtors agreed to the terms of an Asset Purchase Agreement (the "APA"). Under the APA, the Debtors agreed to grant GBG certain rights with respect to the use of the Debtors' trademarks and related intellectual property. GBG would receive the right to design, manufacture, and import footwear and hosiery bearing the Debtors' trademarks and the exclusive right to distribute and sell footwear and hosiery through certain distribution channels.

Under the APA, GBG agreed to purchase, *inter alia*, inventory that the Debtors already had on hand, all of the inventory subsequently ordered and received by the Debtors, and the

---

[5] D.I. 1152.
[6] D.I. 1176 and D.I. 1182.

Debtors' outstanding purchase orders at the time of closing. GBG further agreed to take assignment of any leases and executory contracts assumed by the Debtors.

The APA also contained a handful of conditions precedent to closing of the deal, including in relevant part: (a) that the parties execute a mutually acceptable Transition Services Agreement ("TSA"), (b) that the Court enter a Confirmation Order approving the Plan and the GBG Sale Agreements by January 9, 2018; and (c) that the deal close by January 25, 2018. To keep inventory in stock during the period between execution of the APA and closing the deal, the Debtors continued ordering new inventory.

On January 4, 2018, Wiesner Products, Inc. ("Wiesner") filed an adversary complaint regarding a rejected license agreement, along with an emergency motion to adjourn the January 9, 2018 confirmation hearing. On January 5, 2018, as a result of the complaint and motion to adjourn, the Court held a telephonic status conference during which the Court agreed to adjourn the confirmation hearing to January 11, 2018.

Because an agreement had not been reached with Wiesner, and the TSA between GBG and the Debtors was not finalized in time for the January 11, 2018 confirmation hearing, the hearing again was continued to January 17, 2018. On the morning of January 17, 2018, shortly before commencement of the continued confirmation hearing, GBG sent a termination notice, terminating the APA on two grounds: (a) the Court had not entered a confirmation order by January 9, 2018, and (b) the parties had not yet reached an agreement on the TSA.

<u>The auction and dispute between Polk and THL over allocation of the sale proceeds</u>

On February 15-16, 2018, the Debtors conducted a successful auction of their assets, approved by the Court on February 21, 2018.[7] Thereafter, Polk's and THL's dispute over allocation of the auction proceeds was brought to the Court through the filing of three matters:

> (1)   Polk 33 Lending, LLC's Motion to Enforce Agreement by and among the Debtors, Polk 33 Lending, LLC and THL Corporate Finance, Inc. (D.I. 779) ("Polk's Motion to Enforce") in which Polk seeks to enforce the parties' agreement to distribute part of the Sales Proceeds;

> (2)   THL Corporation Finance, Inc.'s Motion for Entry of Order (I) Valuing Secured Claims for Purpose of Allocating Sale Proceeds to Such Secured Claims and (II) Ordering Distributions (D.I. 803) ("THL's Allocation Motion"); and

> (3)   The adversary proceeding captioned *Polk 33 Lending, LLC v. THL Corporate Finance, Inc. (In re Aerogroup International, Inc.)* (Adv. Pro. No. 18-50383) (the "Adversary Proceeding"), in which Polk asserts a breach of contract action against THL for allegedly failing to comply with certain payment obligations due to Polk under the parties' lender agreement dated February 12, 2018.[8]

The Court held an evidentiary hearing on the Polk/THL Contested Matters and, after post-trial briefing, ultimately issued an Opinion and Order dated March 26, 2019, determining (among other issues) the allocation of the auction sale proceeds between THL and Polk.[9]

<u>The foreclosure and forbearance agreement</u>

On July 24, 2018 (that is, after the hearing on the allocation motions, but before post-trial briefing was due), Polk advised the Court that it had exercised its rights and remedies with respect

---

[7] D.I. 671.

[8] The Polk Motion, the THL Motion and the Adversary Proceeding are referred to as the "Polk/THL Contested Matters."

[9] *In re Aerogroup Int'l, Inc.*, 2019 WL 1407007 (Bankr. D. Del. Mar. 26, 2019). This opinion - - referred to by the parties as the "Allocation Decision" - - determined how to split the proceeds between the competing secured claims of THL, which holds a first priority lien on the Term Priority Defined Collateral (including the Debtors' intellectual property and goodwill associated therewith), and Polk, which holds a first priority lien on the DIP Priority Collateral (including the Debtors' commercial tort claims, as well as the accounts receivable, inventory and inventory deposits).

to the Debtors' commercial tort claim against GBG, which was part of the DIP Collateral that had

been excluded from the auction.[10]  Polk noted that the Debtors had defaulted under the DIP loan

documents and, therefore, Polk intended to hold a UCC Sale of the claim on August 3, 2018.[11]

The Debtors disputed the accuracy of the Article 9 Notice and requested an emergency status

conference pursuant to Bankruptcy Code § 105(d) to discuss issues raised by Polk's proposed UCC

Sale.[12]  The Court held a telephonic hearing on July 24, 2018.  At the hearing, THL appeared and

argued:

> Certainly, Polk has a first lien on the D&O claims and the Global Brands
> litigation.  But we also have an interest, as does Paladin, as junior lienholders.
> And there are at least two situations here where Polk would not necessarily be the
> party that should be driving the process:
> One . . . it is possible that, based upon Your Honor's ruling with the
> allocation dispute, that Polk is oversecured; in other words, that they're paid in
> full, in which case these claims and causes of action, which I believe the estate
> should pursue, THL would be the primary, or at least the next in line to receive
> any proceeds from those claims and causes of action.
> Relatedly, in terms of any foreclosure process, it's unclear to me, at this
> point, how Polk or anyone else would know what amount, if any they would be
> entitled to credit bid.  You know, they have obligations outstanding, but the
> amount is unclear, as we stand here today.
> Additionally, Your Honor, . . . in the notice, Polk asserts that the claim
> could be worth as much as $40 million.  If that's true, then, again, THL and
> Paladin, among others, have great interest in how the litigation plays out, and the
> allocation of the proceeds with respect thereto.  If Polk takes the steps that it wants
> to take today, either in terms of selling - - trying to publicly sell these claims to a
> third party, or use its obligations and its currency to credit bid, the - - they're not
> incentivized [to] maximize that value for all parties-in-interest.  Rather, they
> would be entitled to either sell or settle for what they're owed, again, whatever
> that amount may be.
> These . . . post-petition claims, they're assets of the estate, they should
> remain in the estate, they should be pursued by the estate with all parties-in-
> interest having a say. [13]

---

[10] D.I. 1026.

[11] See D.I. 1026 and attached "Notice of Disposition of Collateral" (the "Article 9 Notice").

[12] D.I. 1025.

[13] Tr. 7/24/2019 (D.I. 1039) at 10:20 – 12:2.

At a second telephonic status conference on August 6, 2018, the Debtors announced that

they had entered into a forbearance agreement with Polk (the "Forbearance Agreement"), a copy

of which was filed with the Court. [14]  Pursuant to the Forbearance Agreement, Polk agreed to

forbear from exercising its rights against the GBG claims,[15] and the Debtors acknowledged and

agreed that:

> Pursuant to paragraph 12 of the Final DIP Order, the DIP Priority Collateral
> includes, without limitation, "all commercial tort claims (including D&O
> Claims)" and "all other claims and causes of action and proceeds thereof." Final
> DIP Order, ¶ 12(a).  The DIP Priority Collateral includes all claims and causes of
> action that the Debtors have or may have against Global Brands Group Holding
> Limited and/or Global Brands Group USA a/k/a GBG USA Inc. or other related
> parties in connection with the Debtors' chapter 11 bankruptcy cases pending in
> the United States Bankruptcy Court for the District of Delaware, Case 17-11962
> (KJC) (Jointly Administered) (such claims, the "GBG Claims").[16]

The GBG litigation and settlement

On August 30, 2018, the Debtors commenced adversary proceeding no. 18-50715 in this

Court by filing a complaint against GBG alleging that GBG improperly terminated the APA (the

"GBG Litigation").  The complaint asserted claims for breach of contract, breach of the implied

covenant of good faith and fair dealing, promissory estoppel, fraudulent misrepresentation, and

equitable estoppel.  With regard to damages, the Debtor sought, "all damages to which Plaintiffs

[Debtors] are entitled, including, without limitation, "benefit of the bargain," actual, reliance,

compensatory, and/or punitive damages." [17]

---

[14] The Notice of Filing Forbearance Agreement, with a copy of the Forbearance Agreement
attached, is filed at D.I. 1040.
[15] Tr. 8/5/2019 (D.I. 1051) at 3:12 – 4:3.
[16] Forbearance Agreement, Recital ¶ E.
[17] Adv. No. 18-50715, D.I. 1 at 18.

GBG answered the complaint on January 9, 2019, denying the Debtors' allegations and asserting several affirmative defenses. GBG argues, *inter alia*, that it was contractually entitled to terminate the APA, and that the Debtors would be unable to recover their lost enterprise value.

Beginning November 19, 2018, the Debtors and GBG met to explore resolution of the Adversary Proceeding. On February 25, 2019, the Debtors and GBG engaged in mediation before the Honorable Kevin Gross. After extensive negotiations, the parties reached the settlement terms embodied in the Settlement Agreement.[18]

Briefly, the Settlement Agreement provides, in part, that (i) within five days of an Order approving the Settlement Agreement, GBG shall pay a settlement amount to counsel for the Debtors (the "Settlement Payment"); (ii) within three days after receipt of the Settlement Payment, the Debtors will dismiss the Adversary Proceeding, with prejudice; and (iii) the Debtors and GBG will mutually release each other from all claims, including those brought by the Debtors in the adversary proceeding.

The Debtors asked the Court to enter an Order approving the Settlement Agreement and "provid[ing] for the release of the Settlement Payment, less attorneys' fees and expenses, to the DIP Lender as the first-priority lienholder over the litigation proceeds stemming from the Adversary Proceeding."[19]

In its limited objection, THL does *not* object to approval of the Settlement Agreement, but objects to the proposed form of Order which provides that, after payment of attorneys' fees and expenses, the remaining amount of the Settlement Payment should be paid to the DIP Lender (i.e.,

---

[18] An unredacted copy of the Settlement Agreement was attached as revised Exhibit B to the Settlement Motion by the Notice of Filing Revised Exhibit B (D.I. 1148) dated April 11, 2019.

[19] Settlement Motion, ¶ 23.

Polk). THL argues that the Settlement Payment includes value attributable to the Debtors' intellectual property and its associated goodwill, assets on which THL holds a first lien.

In response, the Debtors argue that payment to Polk is consistent with the Final DIP Order which provided that the DIP Priority Collateral includes proceeds of "all commercial tort claims," including those "now owned by or owing to, or hereafter acquired by, or arising in favor of, the Debtors."[20] The Debtors also point out that they acknowledged Polk's first lien on the GBG Litigation in the publicly-filed Forbearance Agreement. THL was aware of, but did not object to, the terms of the Forbearance Agreement.

## DISCUSSION

### (1) Approval of the Settlement Agreement

"To minimize litigation and expedite the administration of a bankruptcy estate, '[c]ompromises are favored in bankruptcy.'"[21] However, "the unique nature of the bankruptcy process means that judges must carefully examine settlements before approving them."[22] "[T]he decision whether to approve a compromise under Rule 9019 is committed to the sound discretion of the Court, which must determine if the compromise is fair, reasonable, and in the interest of the estate."[23]

---

[20] *See* Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing and Grant Security Interests and Superpriority Administrative Expense Status with Respect to the DIP Collateral; (II) Granting Adequate Protection to the Prepetition Secured Credit Parties; (III) Modifying the Automatic Stay; (IV) Authorizing the Debtor to Enter Into Agreements with Polk 33 Lending, LLC (V) Authorizing Use of Cash Collateral; and (VI) Granting Related Relief, ¶ 12 (D.I. 231) (the "Final DIP Order").

[21] *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996).

[22] *Will v. Northwestern Univ. (In re Nutraquest, Inc.)*, 434 F.3d 639, 644 (3d Cir. 2006).

[23] *In re Louise's, Inc.*, 211 B.R. 798, 801 (D. Del. 1997).

A bankruptcy court may approve settlements under Bankruptcy Rule 9019[24] or as part of a debtor's plan.[25]   Bankruptcy courts should consider four factors when evaluating a proposed settlement:

(1)    the probability of success in litigation;

(2)    the likely difficulties in collection;

(3)    the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and

(4)    the paramount interest of the creditors.[26]

In evaluating the probability of success in litigation, the court is not required "to decide the numerous questions of law and fact raised by [the objections], but rather to canvass the issues to see whether the settlement fall[s] below the lowest point in the range of reasonableness."[27]

No objections have been raised to the proposed Settlement Agreement between the Debtors and GBG.  In the Settlement Motion, the Debtors argue that consideration of the four factors used to evaluate a settlement apply here to provide ample reasons to approve the settlement.  The Debtors claim that ultimate success of the litigation is uncertain because GBG alleges that the Debtors failed to meet the conditions precedent for closing the APA.  The parties would have to take extensive discovery to prove the Debtors' argument that GBG had agreed to waive the confirmation hearing deadline.  Further, the Debtors allege that even if it was successful on the

---

[24] Fed. R. Bankr. P. 9019 ("On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement.  Notice shall be given to creditors, the United States trustee, the debtor and indenture trustees as provided in Rule 2002 and to any other entity as the court may direct.")

[25] 11 U.S.C. § 1123(b)(3)(A) provides that a plan may include "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate;" and § 1123(b)(6) provides that a plan may include "any other appropriate provision not inconsistent with the applicable provisions of this title."

[26] *Martin*, 91 F.3d at 393 (citing *Protective Committee for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424-25, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968)).

[27] *In re Exide Technologies*, 303 B.R. 48, 68 (Bankr. D. Del. 2003) (quoting *In re Neshaminy Office Bldg. Assoc.*, 62 F.R. 798, 803 (E.D. Pa. 1986)).

merits, it could have problems collecting any judgment against GBG, which recently sold much of its assets, and its parent corporation is based in Hong Kong. Also, litigation would be risky, complex, lengthy and expensive. Discovery would require multiple depositions of parties scattered around the world. Costly expert testimony would be needed to prove damages on industry-specific issues in an industry that changes rapidly. Finally, approval of the settlement is in the best interests of creditors since it provides and immediate recovery and avoids substantial costs, delays and risks of litigation.

The Debtors have demonstrated that the Settlement Agreement is fair and reasonable and should be approved.

### (2) Distribution of Settlement Proceeds

The dispute - - once again - - before this Court is the allocation of the Settlement Payment (after deduction of reasonable attorneys' fees and expenses) between Polk and THL. Polk asserts that the Final DIP Order, as acknowledged in the Forbearance Agreement, is clear: the DIP Priority Collateral was defined to include: "all commercial tort claims," and the Forbearance Agreement went further to acknowledge specifically that Polk's DIP Priority Collateral includes the GBG Claims.[28] Polk also points out that THL acknowledged Polk's first lien on the GBG Claims on the record in Court and in pleadings filed with the Court.[29]

THL argues, however, that the Settlement Payment includes proceeds of its collateral, i.e., the Debtors' intellectual property (the "IP") and the goodwill associated with the IP. Settlement

---

[28] D.I. 1040-1, Recital ¶ E.

[29] *See* n. 13, *supra* citing Tr. 7/24/2018 at 10:20 – 12:2; *see also* Limited Objection of THL to Debtors' Application for Authority to Employ and Retain Reid Collins & Tsai, LLP, as Special Litigation Counsel Nunc Pro Tunc (D.I. 1074) at Ex. A, ¶ 4 (When disputing how to fund expenses for the GBG Litigation, THL attached its own proposed order, providing that "[I]n the event that Polk's allowed claim is paid in full, such that THL receives proceeds from the litigation, then THL agrees to pay its pro rata share of any expenses.").

of the GBG Litigation resolves claims asserting that GBG's wrongful termination of the APA decreased the value of the Debtors' assets, which, THL reasons, includes the IP.   THL relies on a decision by the Court of Appeals for the Eighth Circuit, holding that "a superior interest in proceeds of original collateral is not displaced simply because damage to that collateral gives rise to a subsequent commercial tort claim."[30]   In *Bayer*, the Court determined that a secured creditor with a first lien on equipment (among other things) held an interest prior to a later secured creditor with a lien on the commercial tort claim when the settlement amount arose from a lawsuit for damages caused by the defendant to the plaintiff's plant, equipment and improvements.

Polk distinguishes *Bayer* and similar cases by arguing that those cases concern settlements arising from actual and quantifiable damages to the secured party's collateral - - such as the specific equipment in *Bayer*.[31]   "[A] security interest attaches to any identifiable proceeds of collateral."[32] "If a suit against someone who steals or damages collateral eventuates in an award measured by the diminution in the value of the collateral caused by the defendant's wrongdoing, so that the award restores the original value of the collateral, the award, like an insurance payment for damages collateral, constitutes 'proceeds' of the collateral and is therefore covered by the lender's security interest."[33]

The settlement here, though, resolves the GBG Claims asserted in the Complaint, which asked the Court to award judgment in favor of the Debtors for "all damages to which Plaintiffs [Debtors] are entitled, including, without limitation, "benefit of the bargain," actual, reliance,

---

[30] *Bayer CropScience, LLC v. Stearns Bank Nat'l Ass'n*, 837 F.3d 911, 916 (8th Cir. 2016).

[31] *Bayer*, 837 F.3d at 916 ("When Bayer damaged Texana's equipment in 2006, Stearns Bank's interest attached to the right of recovery for damages to the equipment); *Weirsma v. O.H. Kruse Grain and Milling (In re Wiersma)*, 324 B.R 92, 109 (B.A.P. 9th Cir. 2005) *aff'd in part, rev'd in part*, 483 F.3d 933 (9th Cir. 2007) (specifically identifying the damage to cows that represent proceeds of the secured party's collateral).

[32] *See* 6 Del. C. § 9-315(a).

[33] *Helms v. Certified Packaging Corp.*, 551 F.3d 675, 678 (7th Cir. 2008).

compensatory, and/or punitive damages."[34]  What is missing, here, is any identification of claims

for damage to specific collateral. In *Helms*, the court determined that a secured party's security

interest in equipment would extend to proceeds for a property damage claim, but did not extend to

the settlement proceeds of an action for failure to obtain business loss insurance.[35]  "[R]eplacing a

business loss is not restoring the value of damaged collateral.  There is no necessary relation

between the value of collateral and a business loss that results from its being destroyed or

damaged."[36]

Here, THL has not shown that the Settlement Payment includes *identifiable* proceeds of its

specific collateral.  THL's suggestion to allocate the Settlement Payment in accordance with the

Allocation Decision is not helpful because the auction sale of the Debtors' assets and the GBG

Claims are distinct.  Even assuming (without deciding) that some piece of the Settlement Payment

represents a loss to the value of the Debtors' IP, THL would need to demonstrate the portion of

the commingled Settlement Payment proceeds that are traceable to the IP.[37]  Allowing THL to

attempt to perform such tracing would run counter to THL's previous position as asserted in prior

hearings before this Court and in pleadings. To the extent THL argues that it "reserved its rights,"

it is clear to me from the record that THL's concern was that Polk was not incentivized with respect

to how its collateral would be liquidated, which might impair THL's recovery. That is not what

---

[34] Adv. No. 18-50715, D.I. 1 at 18.

[35] *Helms*, 551 F.3d at 678.

[36] *Id.*

[37] Section 9-315 of The Uniform Commercial Code provides in pertinent part:
> **When commingled proceeds identifiable.** -- Proceeds that are commingled
> with other property are identifiable proceeds:
>
> . . . .
> (2) if the proceeds are not goods, to the extent that the secured party identifies
> the proceeds by a method of tracing, including application of equitable
> principles, that is permitted under law other than this Article with respect to
> commingled property of the type involved.

6 Del. C. § 9-315(b).

happened here.  Moreover, the Debtors and Polk acted in reliance on THL's acquiescence when they entered into the Forbearance Agreement.  In addition to the statements made at the emergency hearing on July 24, 2018 (discussed *supra.*), THL was aware that the Debtors and Polk entered into a Forbearance Agreement at the telephonic hearing on August 6, 2018.[38]  When the Forbearance Agreement was filed later that day, THL did not file any objection or request for further hearing on the matter.[39]  As the litigious history of this case clearly demonstrates, the parties knew how to contact the Court when there was any dispute.

Recognizing Polk's first lien on the settlement proceeds arising from the GBG Claims is entirely consistent with the documents and order(s) granting it a first lien on commercial tort claims and with active, vociferous, and multiple proceedings that have already taken place in connection with this matter.  THL's limited objection will be overruled.  An appropriate Order follows.[40]

BY THE COURT:

KEVIN J. CAREY
UNITED STATES BANKRUPTCY JUDGE

Dated  May 13, 2019

---

[38] Tr. 8/6/2018 (D.I. 1051).

[39] D.I. 1040 (Forbearance Agreement).

[40] At the outset of the April 23, 2019 hearing on the Settlement Motion, the parties announced that they had settled the one remaining issue not determined by the March 26, 2019 Opinion and Order disposing of the allocation dispute. However, after yet another unhappy hearing, Polk's counsel seemed to reject the notion of any settlement due to THL's "limited objection" to the proposed order approving the Settlement Motion. Tr. 4/23/2019 (D.I. 1169) at 28:14 – 29:4. The parties are directed to contact the Court to schedule a telephonic status hearing to advise the Court whether the consensual settlement is firm or whether the parties intend to engage in further carping.